## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSSETS

| | |
|---|---|
| REV. ANNE B. BANCROFT, JOHN T. COATES, and JUDY and MARTY ARICK, Individually and On Behalf of All Others Similarly Situated,<br><br>           Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey Corporation,<br><br>           Defendant. | CIVIL ACTION NO.  1:15-cv-13522<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs     Reverend   Anne   B.   Bancroft,   John   T.   Coates,   Judy   and   Marty   Arick ("Plaintiffs"),  individually  and  on  behalf  of  all  others  similarly  situated,  allege  the  following against  Volkswagen  Group  of  America,  Inc.  ("Volkswagen"  or  the  "Company"),  based  on personal knowledge, information and belief and the investigation of counsel.  This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

*          *          *

"*[I am] deeply sorry that we have broken the trust of our customers and the public.*"

*-Dr. Martin Winterkorn, former Volkswagen Group CEO*

## NATURE OF THE ACTION

1.      Since 2008, Volkswagen has been part of an intentional scheme to circumvent United  States  Environmental  Protection  Agency  ("EPA")  automobile  emissions  laws  and deceive  consumers  into  believing  that  certain  Volkswagen  and  Audi  vehicles  equipped  with "clean diesel" turbo TDI 2.0 liter engines ("TDI Engines" or "TDI Engine Systems") were compliant with federal and state emissions laws – all the time knowing that they were not.

2.      The TDI Engines were aggressively marketed to American consumers as having an unprecedented combination of features: the high-performance of a gasoline engine with the gas mileage of an electric hybrid and the lowest emissions of any non-electric automobile on the U.S. market.  As the world now knows, this marketing campaign was a sham and, in fact, cars equipped with the TDI Engines could not even meet minimal U.S. and state emission standards in open road driving.  This fact was hidden from both the public and regulators through a scheme to cheat the emission testing process.

3.      Specifically, these vehicles (the "Affected Vehicles") were secretly equipped with certain software called "Defeat Devices," which were designed by Volkswagen to fool

emission testers.  The Defeat Devices would turn on the full emission control system in the TDI Engines only when the car was undergoing emission testing.  Once the emission test was completed, the car's emission control system shuts off – thus improving performance and mileage, but also resulting in the car emitting up to 40 times more pollution than allowed by U.S. and state regulations.

4.      The sheer size of this fraud is staggering, with the Defeat Devices being installed on some of the most popular model cars in the United States, including the following models equipped with the TDI Engines: Jetta (Model Years ("MY") 2009-2015), Jetta Sportwagen (MY 2009-2014), Beetle (MY 2012-2015), Beetle Convertible (MY 2012-2015), Audi A3 (MY 2010-2015), Golf (MY 2010-2015), Golf Sportwagen (MY 2015) and Passat (MY 2012-2015).

5.      As a result of this fraud, over half a million United States consumers currently own and drive vehicles that are not "street legal" – meaning that their automobiles' level of omissions are in violation of both federal and state regulations.  The EPA has estimated that Volkswagen could face penalties of up to $18 billion.

6.      Consumers who unknowingly purchased vehicles equipped with the Defeat Devices were defrauded.  If they had known these vehicles were equipped with these devices, they either would not have purchased the vehicle or would have purchased it at a much lower price.

7.      This class action, on behalf of a Massachusetts Subclass and a Nationwide Class of consumers who purchased the Affected Vehicles (collectively, the Massachusetts Subclass and the Nationwide Class are referred to herein as the "Class"), seeks injunctive relief and damages as redress for the fraud perpetrated against them.

## PARTIES

8.      Plaintiff Reverend Anne B. Bancroft ("Bancroft") is a resident and citizen of the Commonwealth of Massachusetts.   In 2009, Bancroft purchased a 2009 model year Jetta Sportswagen ("Jetta") equipped with the 2.0 liter TDI clean diesel engine at a Massachusetts dealership based upon Volkswagen's representations regarding the vehicle's performance, gas mileage and low emissions – not knowing that the vehicle was equipped with the Defeat Device.

9.      Bancroft purchased the Jetta because she was impressed by Volkswagen's advertisements and representations regarding the TDI Engine's combination of low emissions and high gas mileage.  She knew she was paying a premium for the Jetta over and above what she would pay for a similar vehicle with a gasoline engine, but did so because she wanted to own an environmentally-friendly automobile.

1.      Plaintiff John T. Coates ("Coates") is a part-time resident of the Commonwealth of Massachusetts.  In 2011, Coates purchased a 2011 model year Golf ("Golf")[1] equipped with the 2.0 liter TDI clean diesel engine at a Massachusetts dealership based upon Volkswagen's representations regarding the vehicle's performance, gas mileage and low emission – not knowing that the vehicle was equipped with the Defeat Device.

2.      Coates purchased the Golf because he was impressed by Volkswagen's advertisements and representations regarding the TDI Engine's combination of low emissions and high gas mileage.  He knew he was paying a premium for the Golf over and above what he

---

[1]Mr. Coates's Golf, Ms. Bancroft's Jetta and the Arick's Jetta are hereinafter collectively referred to as the "Vehicles."

would pay for a similar vehicle with a gasoline engine, but did so because he wanted to own an environmentally-friendly automobile.

3.  Plaintiffs Judy and Marty Arick (the "Aricks") are residents and citizens of the Commonwealth of Massachusetts.  The Aricks purchased a 2011 model year Jetta Sportswagen ("Jetta") equipped with the 2.0 liter TDI clean diesel engine at a Massachusetts dealership based upon Volkswagen's representations regarding the vehicle's performance, gas mileage and low emission – not knowing that the vehicle was equipped with the Defeat Device.

4.  The Aricks purchased the Jetta because they were impressed by Volkswagen's advertisements and representations regarding the TDI Engine's combination of low emissions and high gas mileage.  They knew they were paying a premium for the Jetta over and above what they would pay for a similar vehicle with a gasoline engine, but did so because they wanted to own an environmentally-friendly automobile.

5.  Volkswagen is a corporation doing business in all 50 states (including the District of Columbia) and is organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  As such, Volkswagen is a citizen of New Jersey and Virginia.

6.  At all times relevant to this action, Volkswagen was involved in designing, engineering, manufacturing, assembling, testing, marketing, distributing and selling the Affected Vehicles.  Volkswagen also developed and disseminated the owners' manual, warranty booklets, advertisements and other promotional materials relating to the Affected Vehicles.

## JURISDICTION AND VENUE

7.  This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a). The proposed Class consists of more than 100 members and the amount in controversy for the

Class exceeds $5,000,000, exclusive of interest and costs. Plaintiffs and other putative Class members are citizens of a different state than Volkswagen.

8.     This Court has personal jurisdiction over Plaintiffs because they submit to this Court's jurisdiction. This Court has personal jurisdiction over Volkswagen because it conducts substantial business in the District.

9.     Venue is proper in this district under 28 U.S.C. § 1391 because Volkswagen is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Volkswagen advertised and sold the impacted vehicles from this district and Volkswagen caused injury to Class members residing in this district.

<u>**SUBSTATIVE ALLEGATIONS**</u>

**I.     CORPORATE BACKGROUND**

10.     Volkswagen has been the North American operational headquarters for the Volkswagen Group of Automobile Companies of Germany since 1955, when it first introduced the innovative and counter-culture[2] "Beetle" or "Bug" model to U.S. consumers. The Beetle was a two-door, four-passenger, rear-engine economy car designed for sustained high speed on the *autobahn*.[3] The picture below is of an early model Volkswagen Beetle.

---

[2] The Beetle's unconventional body design made it a favorite among the counter-culture in the 1960's and is often associated with the so-called "flower power" movement of the time.

[3] *Autobahn* is the federal controlled-access highway system in German that is renowned for having no mandated speed limit for certain classes of vehicles. Germany's autobahn network has a total length of about 12,917 kilometers (8,026 mi) in 2014, which ranks it among the most dense and longest systems in the world.



11.     Volkswagen's popularity would grow rapidly in the 1950s and 1960s, with total U.S. sales reaching 569,696 cars in 1970, when Volkswagen captured 7 percent of the U.S. car market and had over a thousand American dealerships.  The Beetle was the Company's best seller in the United States at that time by a wide margin.  In the ensuing years, Volkswagen would introduce a variety of makes and models to the U.S. automobile market, many of which were well received and gained widespread popularity, including but not limited to: Audi, Bentley, Porsche, Jetta, Golf and Passat.  Volkswagen soon became a staple for U.S automobile consumers and a fixture on American roads.

12.     Volkswagen's success would wane, however, with the advent of the new millennium, as Japanese competition and quality-control issues led to declining sales.  For example, in 2005, Volkswagen's U.S. sales totaled 224,195 vehicles – a reduction of about 37 percent from 2001 – and Volkswagen had not turned a profit for its parent company since 2002. To combat this trend, Volkswagen decided to introduce a new generation of high-performance, low-emission, diesel-engine automobiles to U.S. consumers.

## II.     VOLKSWAGEN'S DIESEL-ENGINE INITIATIVE

### A.     Pros and Cons of Diesel Engines

13.     Gasoline engines and diesel engines both work by internal combustion, but in slightly different ways.  In a gasoline engine, fuel and air is injected into small metal cylinders. A piston compresses the mixture and a small electric spark causes it to ignite.  The resultant explosion generates the energy which powers the driveshaft and turns the wheels of the vehicle.

14.     Diesel engines are similar, but simpler.  First, air is allowed into the cylinder and the piston compresses it – but much more than in a gasoline engine.  In a gasoline engine, the fuel-air mixture is compressed to about a tenth of its original volume.  But in a diesel engine, the air is compressed by anything from 14 to 25 times.  This is referred to as adiabatic compression and it produces heat of 1000° Fahrenheit or more.  When the diesel fuel is injected into the cylinder, the air is so hot that the fuel instantly ignites and explodes without any need for a spark.  The power from the resultant explosion is then used to power the vehicle's drive train in much the same way as a gasoline-powered vehicle.

15.     The diesel engine has the highest thermal efficiency (engine efficiency) of any practical internal or external combustion engine due to its very high compression ratio and hotburn. As a result of this thermal efficiency, diesel engines typically deliver 25-30 percent better fuel economy than similar performing gasoline engines.  However, diesel engines historically have not produced the high performance of gasoline-powered vehicles.  Gasoline engines will run much higher peak rotations per minute ("RPMs") than an equivalent size diesel engine, which translates to more horsepower and better highway performance than their diesel counterparts.

16.     Historically, another drawback to diesel engines has been their high level of emissions.  Diesel fuel does not burn as completely in the engine cylinder as gasoline does.  As a result, soot is discharged through the tailpipe which often includes hundreds of chemical elements, including sulfates, ammonium, nitrates, elemental carbon, condensed organic compounds and even carcinogenic compounds and heavy metals such as arsenic, selenium, cadmium and zinc.[4]  In addition, diesel-powered vehicles and equipment account for nearly half of all nitrogen oxides ("NOx") and more than two-thirds of all particulate matter emissions from U.S. transportation sources.

17.     Until recently, it was common for buses and other forms of public transportation to be powered by diesel engines.  The high gas mileage of diesel engines made them cost effective, and their lack of highway performance was not much of a drawback for the type of city driving required by these vehicles.  Until the recent trend towards replacing diesel-engine buses with electric- and propane-powered vehicles, lumbering, belching, diesel-powered buses were a common site on American city streets, as depicted below:



---

[4]  Particulate Matter (TSP and PM-10) in Minnesota. Minnesota Pollution Control Agency. December 1997.

B.      **Volkswagen Endeavors to Revolutionize Diesel Engine Technology**

18.     In the early 2000s, Volkswagen made a huge investment in diesel-engine technology, betting that their technical prowess would allow them to craft high-performance and efficient diesel engines that could meet increasingly tighter emissions and fuel efficiency standards, and serve as a low-cost alternative to expensive, hybrid electric automobiles. Boldly, Volkswagen forged ahead, planning to make small diesel cars a cornerstone of their U.S. fleet.  When the Company developed the TDI Engine, it seemed that Volkswagen's gamble had paid off.

19.     The TDI Engine is a turbocharged,[5] common-rail, direct-injection, four-cylinder engine with an integrated exhaust after-treatment system.  The engine is turbocharged to improve speed and performance to gasoline engine standards, while the exhaust after-treatment system is designed to make the engine compliant with federal and state emission standards by filtering particulates from the exhaust and reducing NOx emissions through a catalytic process. With the development of the TDI Engine, Volkswagen proclaimed boldly that it had "cracked the low emissions, high fuel economy conundrum"[6] that had beset diesel-engine technology for years:

---

[5] The turbocharger is a turbine-driven forced induction device that increases the engine's efficiency and power output by forcing extra air into the combustion chamber.

[6] Tim De Chant, *Volkswagen's Little Engine that Couldn't*, NovaNext (Sept. 22, 2015), *http://www.pbs.org/wgbh/nova/next/tech/volkswagen-diesel-emissions/*.

---



### III.   VOLKSWAGEN   AGGRESSIVELY   MARKETS   ITS   CLEAN   DIESEL TECHNOLOGY

20.     At conferences and in published papers, Company officials extolled the virtues of the TDI Engine, and its compact, inexpensive exhaust treatment system, which allowed the Company to market clean diesel vehicles at relatively low prices.  Since 2007, the company has sold 11 million cars worldwide with the TDI diesel engine.

21.     The marketing appeal of Volkswagen's clean diesel fleet was simple – have the best of all worlds.  These cars were fun to drive on the open road, but were also socially responsible – delivering high gas mileage and low emissions.  The following is a sample of Volkswagen's marketing campaign for its clean diesel fleet – in this case the Jetta TDI:







22.     Volkswagen's promotions of its clean diesel vehicles were pervasive, with the Company touting that the Audi A3 TDI and VW Jetta TDI were named 2010 Green Car of the Year.  Volkswagen also initiated a "Think Blue" program which extolled the Company's culture of being "more responsible on the road and more environmentally conscious – not just in our cars."

23.     Due to the high-performance and low-emissions of its TDI Engines, the Volkswagen and Audi vehicles equipped with these engines sold at a premium to their gasoline-powered counterparts.  The following table sets forth the price premium in 2015 for each base, mid-level and top-line version of each Affected Vehicle.  Similar premiums existed for each Affected Vehicle for every model year:

**CleanDiesel Price Premiums for 2015**

| Model | Base | Mid-Level | Top-Line |
|-------|------|-----------|----------|
| VW Jetta | $2,860 | $4,300 | $6,315 |
| VW Beetle | $4,635 | n/a | $2,640 |
| VW Golf | $2,950 | $1,000 | $1,00 |

| Model | Base | Mid-Level | Top-Line |
|-------|------|-----------|----------|
| VW Passat | $5,755 | $4,750 | $6,855 |
| Audi A3 | $2,805 | $3,095 | $2,925 |

24.     Volkswagen's marketing claims that the Affected Vehicles had "ultra low emissions" were false and operated as a fraud on U.S. consumers.  In fact, the Affected Vehicles emit large amounts of pollutants in open-road driving, in violation of both federal and state environmental regulations.

**IV.     VOLKSWAGEN CHEATED THE EMISSION TESTING PROCESS TO CONCEAL THAT MANY VEHICLES WITH TDI ENGINES COULD NOT MEET FEDERAL AND STATE EMISSION STANDARDS**

**A.     <u>United States Emission Standards</u>**

25.     Congress established much of the basic structure of the Clean Air Act in 1970. Dense, visible smog in many of the nation's cities and industrial centers helped to prompt passage of the 1970 legislation at the height of the national environmental movement.  There have been several subsequent revisions designed to improve its effectiveness and to target newly-recognized air pollution problems such as acid rain and damage to the stratospheric ozone layer.

26.     The Clean Air Act required the EPA to issue a series of rules to reduce pollution from vehicle exhaust, refueling emissions and evaporating gasoline.  As a result, emissions from a new car purchased today are well over 90 percent cleaner than a new vehicle purchased in 1970.  This applies to SUVs and pickup trucks, as well.  Since 2008, all new passenger vehicles have had to meet stringent tailpipe emission standards.  Today, most states have mandatory

emission testing to ensure that vehicles are in compliance with both federal and state emission standards.

**B.**  **Volkswagen Secretly Developed A Device To Defeat Air Emissions Testing, Boost Performance And Boost Sales Of Its Vehicles Equipped with TDI Engines**

27.  In order to meet stringent emissions standards that went into effect in 2008, most automakers started supplying their diesel automobiles with tanks of a urea-based solution that cuts down on NOx emissions.  Many larger diesel engines on big sedans and SUVs, including some from Audi and the Volkswagen-made Touareg,[7] as well as at BMW and Mercedes, use such a system.  However, the cost of these systems tends to make diesel cars in the United States more expensive than gasoline-powered cars.  In the absence of the urea-based solution systems, meeting emissions requirements requires the use of an alternative emission control system that puts strain on the engine and reduces the power and fuel economy of a vehicle.

28.  Volkswagen's supposed innovation was the development of the light-weight and relatively inexpensive Catalyst with Denoxtronic ("Catalyst").  This light-weight catalyst was designed to break down NOx to its component parts, water and nitrogen, without affecting engine performance or mileage.  The Catalyst is explained in the following excerpt from a Volkswagen promotional presentation:

---

[7]  These particular vehicles utilized the Daimler Auto Group's ("Daimler") BlueTEC technology, which equipped engines with catalytic reduction ("SCR") system that uses diesel exhaust fluid, and a system of NOx absorbers and particulant filters combined with a $NO_x$ reducing systems.  The BlueTEC was on Ward's 10 Best Engines list for 2007 and 2008. Volkswagen had an agreement with Daimler to share the BlueTEC technology, but walked away from this agreement in 2007 because it did not want to dilute Volkswagen's branding of the TDI Engine technology.



29.    As the light-weight catalyst did not require the heavy tanks of a urea-based solution used in some other diesel vehicles, Volkswagen claimed that the Affected Vehicles could replicate the high performance of gasoline-powered engines and maintain high gas mileage.  As the world now knows, this was a lie.

30.    The TDI Engine was equipped with a Defeat Device – a sophisticated software algorithm that would turn on the full emission control system in the TDI Engine only when the car was undergoing emission testing.  Once the emission test was completed, the car's emission control system shuts off – thus improving performance and mileage, but also resulting in the car emitting up to 40 times more pollution than allowed by U.S. and State regulations.

C.    **How The Defeat Device Was Discovered**

31.    Peter Mock, European managing director of the International Counsel on Clean Transportation ("ICCT") discovered the Volkswagen Defeat Device while examining discrepancies between the European tests on diesel models of the Volkswagen Passat, Jetta and the BMW X5.  He suggested that the test be replicated in the United States, so he contacted his colleague at the ICCT, John German.

32.    Working with West Virginia University Center for Alternative Fuels, Engines and Emissions ("WVU"), Mock and German used a portable emission measurement system to test these vehicles on the open road.  The result of this testing revealed that the Jetta exceeded NOx emissions standards by 15 to 35 times and the Passat exceeded NOx emissions standards by 5 to 20 times.  Notably, the BMX X5 tested at or below the emissions standards and performed as advertised.

33.    In 2014, the ICCT-WVU team brought the findings of their testing to the attention of the California Air Resource Board ("CARB") and the EPA.  This prompted CARB and the EPA to start an investigation into the issue, and a dialogue between these agencies and Volkswagen, which culminated in the Company's admission in early September 2015 that it has, since model year 2009, employed the Defeat Device in the Affected Vehicles to circumvent CARB and EPA emission test procedures.

34.    On September 18, 2015, the EPA issued a Notice of Violation ("NOV")[8] announcing the results of its investigation and the discovery of the Defeat Device and the recall of approximately 500,000 vehicles possibly equipped with the Defeat Device.  This NOV revealed, in pertinent part:

> Each VW vehicle identified by the table below has AECDs that were not described in the application for the COC that purportedly covers the vehicle. Specifically, VW manufactured and installed software in the electronic control module (ECM) of these vehicles that sensed when the vehicle was being tested for compliance with EPA emission standards.  For ease of reference, the EPA is calling this the "switch."  The switch senses whether the vehicle is being tested or not based on various inputs including the position of the steering wheel, vehicle speed, the duration of the engine's operation, and barometric pressure. These inputs precisely track the parameters of the federal test procedure used for emission testing for EPA certification purposes.

*       *       *

_____

[8] The NOV is annexed hereto as Exhibit A.

[This switch] was designed to track the parameters of the federal test procedure and caused the emission control systems to underperform when the software determined that the vehicle was not undergoing the federal test procedure.

\*      \*      \*

As such, VW violated sections 203(1) of the CAA, 42 U.S.C. §7522(a)(1), each time it sold, offered for sale, introduced into commerce, delivered for introduction into commerce, or imported . . . one of the hundreds of thousands of new motor vehicles within these test groups.

\*      \*      \*

These vehicles are identified by the table below.  All of these vehicles are equipped with the

[TDI Engines]:

| Model Year | EPA Test Group | Make and Model(s) |
| --- | --- | --- |
| 2009 | 9VWXV02.035N | VW Jetta, VW Jetta Sportswagen |
| 2009 | 9VWXV02.0U5N | VW Jetta, VW Jetta Sportswagen |
| 2010 | AVWXV02.0U5N | VW Gold, VW Jetta, VW Jetta Sportswagen, Audi A3 |
| 2011 | BVWXV02.0U5N | VW Gold, VW Jetta, VW Jetta Sportswagen, Audi A3 |
| 2012 | CVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportswagen, Audi A3 |
| 2012 | CVWXV02.0U4S | VW Passat |
| 2013 | DVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportswagen, Audi A3 |
| 2013 | DVWXV02.0U4S | VW Passat |
| 2014 | EVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportswagen, Audi A3 |
| 2014 | EVWXV02.0U4S | VW Passat |
| 2015 | FVGAV02.0VAL | VW Beetle, VW Beetle Convertible, VW Golf, VW Golf Sportswagen, VW Jetta, VW Passat, Audi A3 |

35.    Also on September 18, 2015, CARB issued an "In-Use Compliance Letter" to Volkswagen announcing that it has initiated an enforcement investigation of Volkswagen regarding all model-year 2009 through 2015 light-duty vehicles equipped with 2.0 liter engines.

36.    On September 21, 2015, Volkswagen announced that it would halt sales of certain of its 2015 diesel engine fleet of automobiles.  It was also revealed on that day that the

U.S. Justice Department's Natural Resources Division was conducting a criminal probe of Volkswagen AG over the alleged cheating on U.S. emissions tests.  This raises the possibility that the Department of Justice could pursue German-based Volkswagen executives.

37.     Worldwide reaction to the news that Volkswagen had intentionally broken environmental regulations and committed fraud against automobile consumers was swift and severe, with the Company's stock dropping 20% when the news became public.  Commentators and the consumers alike were shocked at the sheer audacity of Volkswagen's wrongdoing.  As stated by former marketing executive Peter De Lorenzo at Autoextremist.com:

> There's a measure of arrogance to this that I think people find appalling because they figured they can get away with it – we're smarter than everyone else.[9]

38.     On September 22, 2015, Volkswagen Chief Executive Officer, Martin Winterkorn released a video message stating, "[m]illions of people across the world trust our brands, our cars and our technologies.  I am endlessly sorry that we have disappointed this trust. I apologize in every way to our customers, to authorities and the whole public for the wrongdoing."  On September 23, 2015, Winterkorn resigned.

## V.     THE INJURIES TO PLAINTIFFS AND THE CLASS

39.     As a result of Volkswagen's actions, Plaintiffs and the Class suffered the following injuries, *inter alia*:

> (a) Plaintiffs and the Class paid more for their cars than they otherwise would, had they known the truth about the Defeat Devices.  As discussed in Section III, *supra*, premiums over comparable gasoline models can be as much as $6,855 for certain 2015 models, and possibly higher for other models.

---

[9] Nathan Bomey, *Analysis: Deception fuels Volkswagen's Emission Scandal*, USA Today (Sept. 23, 2015), *http://www.usatoday.com/story/money/cars/2015/09/22/analysis-deception-fuels-volkswagen-emissions-scandal/72608782/.*

(b) While used diesel cars historically were worth more on the used-car market than their gasoline-powered counterparts, it is doubtful that will be the case going forward. The Affected Vehicles, which are currently not street legal, will likely never have the combination of features (*i.e*., high gas mileage, high performance and low emissions) promised to consumers, even after any attempt to fix or remove the Defeat Devices. In fact, based upon preliminary investigation, it appears that Plaintiffs' Vehicles do not have the resale value one would historically expect from diesel-engine vehicles of those years, makes and models.

(c) Because the vehicles with Defeat Devices were apparently non-compliant or illegal to sell in the first place (as they now stand), they may not be able to be re-sold or re-registered.  The result is that owners may not be able drive or sell their TDI vehicles until they are fixed by Volkswagen.

(d) If Volkswagen develops a software fix (and gets it approved) that addresses the EPA and CARB issues, the performance and fuel efficiency of Plaintiffs' and the Class's cars will be significantly degraded.  Thus, Class members' vehicles will no longer perform as they did when purchased or as advertised.

(e) If Volkswagen takes the extra step of both making software changes and retrofitting an entire selective catalytic reduction system to the cars with Defeat Devices, while performance would likely be unchanged, the interior size of the vehicles would need to be reduced to accommodate a liquid-urea tank and associated plumbing.  Thus, the interior of Class members' vehicles would be materially smaller.

## CLASS ACTION ALLEGATIONS

40.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3) on behalf of the following putative classes:

**Nationwide Class:**

All persons who purchased or leased an automobile manufactured by Volkswagen
or Audi that contained a turbo diesel ("TDI Engine") and a Defeat Device.  The
vehicles containing TDI Engines and Defeat Device systems as of September 24,
2015 include the following models: Jetta (Model Years ("MY") 2009-2015), Jetta
Sportwagen (MY 2009-2014), Beetle (MY 2012-2015), Beetle Convertible (MY
2012-2015), Audi A3 (MY 2010-2015), Golf (MY 2010-2015), Golf Sportwagen
(MY 2015) and Passat (MY 2012-2015).

**Massachusetts Subclass:**

All persons in Massachusetts who purchased or leased an automobile
manufactured by Volkswagen or Audi that contained a turbo diesel engine ("TDI
Engine") and a Defeat Device.  The vehicles containing TDI Engines and Defeat
Device systems as of September 24, 2015 include the following models: Jetta
(Model Years ("MY") 2009-2015), Jetta Sportwagen (MY 2009-2014), Beetle
(MY 2012-2015), Beetle Convertible (MY 2012-2015), Audi A3 (MY 2010-
2015), Golf (MY 2010-2015), Golf Sportwagen (MY 2015) and Passat (MY
2012-2015).

41.     Excluded from the Class are individuals who have only personal injury claims

resulting from the Defeat Device in the TDI Engine System.  Also excluded from the Class are

Volkswagen and its subsidiaries and affiliates; all persons who make a timely election to be

excluded from the Class; governmental entities; and the judge to whom this case is assigned and

his/her immediate family.  Plaintiffs reserve the right to revise the Class definitions based upon

information learned through discovery.

42.     The members of the putative Nationwide Class and the Massachusetts Subclass

are so numerous that joinder of all members is impracticable ("Class Members").  Although the

exact number of putative Class Members is unknown at this time and can only be ascertained

through appropriate discovery, Plaintiffs believe that approximately 500,000 Affected Vehicles contain the illegal Defeat Devices.

43.     Common questions of law and fact exist as to all members of the putative Class and predominate over any questions affecting solely individual members of the putative Class. Among the questions of law and fact common to the putative Class are:

(a) Whether Volkswagen intentionally or negligently installed the Defeat Devices in the Affected Vehicles;

(b) Whether Volkswagen committed fraud based on the facts alleged herein;

(c) Whether Volkswagen violated federal and state law based upon the facts alleged herein;

(d) Whether Volkswagen's unfair and/or deceptive acts or practices, as alleged herein, harmed Plaintiffs and the members of the putative Class;

(e) Whether Volkswagen made and breached express warranties regarding the ability of the vehicles to pass required emissions testing and the vehicles' performance and fuel efficiency;

(f) Whether Volkswagen made and breached an implied warranty of fitness for a particular purpose regarding the ability of the vehicles to pass required emissions testing and the vehicles' performance;

(g) Whether Volkswagen made misrepresentations of a material present or past fact with the intent to deceive Plaintiffs and the members of the putative Class;

(h) Whether Volkswagen was unjustly enriched by its conduct complained of herein;

(i) Whether the Audi and Volkswagen models listed herein have been diminished in value because of Volkswagen's conduct complained of herein;

(j) Whether the members of the putative Class are entitled to injunctive relief; and

(k) Whether the members of the putative Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

44.     Plaintiffs' claims are typical of the claims of the members of the putative Class as Plaintiffs and members of the putative Class sustained damages arising out of Volkswagen's wrongful conduct as complained of herein.  The relief Plaintiffs seek is typical of the relief sought by the members of the putative Class.

45.     Plaintiffs will fairly and adequately protect the interests of the members of the putative Class and have retained counsel competent and experienced in class litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the putative Class.

46.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all members of this putative Class is impracticable. Furthermore, because the damages suffered by putative Class Members may be relatively small, the expense and burden of individual litigation make it impossible for the putative Class Members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## TOLLING OF THE STATUTE OF LIMITATIONS

47.     To the extent that a statute of limitations may otherwise be applicable to this case, Volkswagen's actions prevent its application.

48.     As alleged above, Volkswagen concealed and misrepresented the facts concerning the actual emissions levels of its vehicles containing Defeat Devices and failed to report these facts to federal and state regulators, dealerships and consumers.

49.     Because Plaintiffs and members of the putative Class could not, through the exercise of reasonable diligence and within any applicable statute of limitations, have discovered the existence of the Defeat Devices, all otherwise statutes of limitations were tolled under the discovery rule.

50.     Because Volkswagen fraudulently concealed these facts, all applicable statues of limitations have been tolled.

51.     Because Volkswagen was under a duty to reveal the facts described above, and failed to reveal this information and intentionally evaded state and federal regulations, it is stopped from relying on any statutes of limitations in defense of this action.

## COUNTS

### COUNT I
### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *et. seq*.
### (On Behalf of the Nationwide Class)

52.     Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

53.     Plaintiffs assert this cause of action on behalf of the Nationwide Class.

54.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 15 U.S.C. § 2301(3).

55.     Volkswagen's Affected Vehicles are "consumer products" pursuant to 15 U.S.C. § 2301(1).

56.     Plaintiffs and the Class are "consumers" pursuant to 15 U.S.C. § 2301(3).

57.     Volkswagen is a "warrantor" and "supplier" pursuant to 15 U.S.C. §§ 2301(4) and (5).

58.     Volkswagen provided Plaintiffs and the Class with "implied warranties," as that term is defined by 15 U.S.C. § 2301(7).  As a part of the implied warranty of merchantability, Volkswagen warranted that the Affected Vehicles would pass without objection in the trade as designed, manufactured and marketed, and were adequately labeled.

59.     As discussed more fully, *supra,* Volkswagen has breached those implied warranties by, among other things, selling defective automobiles to Plaintiffs and the Class Members which were not "street legal" and which did not possess the attributes which were warranted.

60.     Volkswagen knew the Affected Vehicles' were defective and, by its actions and inactions in the face of this knowledge, Volkswagen has breached its obligations and duties under its written and implied promises, warranties and representations made to and directed at the Plaintiffs and the Class Members.

61.     Any efforts to limit the implied warranties in a manner that would exclude coverage of the Affected Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Affected Vehicles is null and void.

62.     Plaintiffs and the Class Members have had sufficient direct dealings with either Volkswagen or its agents (dealerships) to establish privity of contract.

63.     Nonetheless, privity is not required here because Plaintiffs and Class Members are intended third-party beneficiaries of contracts between Volkswagen and its dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Affected Vehicles and have no rights under the warranty agreements provided

with the Affected Vehicles; the warranty agreements were designed for and intended to benefit consumers.

64.     15 U.S.C. § 2310(d)(1) provides a private right of action for any consumer who is damaged by the failure of a warrantor to comply with the obligations inherent in an implied warranty.

65.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Volkswagen notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

66.     Plaintiffs' individual claims place into controversy an amount equal to or exceeding $25.  The amount in controversy of this entire action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of the Class Members, seek all damages permitted by law, including diminution in the value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Class Members in connection with the commencement and prosecution of this action.

67.     As a result of Volkswagen's conduct, Plaintiffs and a nationwide class of those who purchased the Affected Vehicles are entitled to revoke their acceptance of the said vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. § 2310.

**COUNT II**
**FRAUD IN THE INDUCEMENT**
**(On Behalf of the Nationwide Class and the Massachusetts Subclass)**

68.     Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

69.     Plaintiffs assert this cause of action on behalf of the Nationwide Class and the Massachusetts Subclass.

70.     Volkswagen engaged in both speaking and silent fraud, and in fraudulent and deceptive conduct.  As described above, Volkswagen's conduct defrauded Plaintiffs and Class Members, intending and leading them to believe, through affirmative misrepresentations, omissions, suppression and concealments of material fact, that the Affected Vehicles, marketed by Volkswagen as "clean diesel" vehicles, possessed important characteristics that they in fact did not possess – namely the combination of low emissions, high performance and fuel economy – and inducing their purchases.

71.     Volkswagen's intentional and material misrepresentations included, among other things, its advertising, marketing materials and messages, and other standardized statements claiming the Affected Vehicles: (a) were clean and eco-friendly and (b) combined low emissions with high performance and strong fuel economy.

72.     The foregoing misrepresentations were uniform across all Class Members.  The same advertisements were shown to all members of the public generally and the same marketing materials were distributed to customers and potential customers, and all of the materials contained the same standardized statements relating to the Affected Vehicles' environmental friendliness, performance and fuel economy.

73.     These representations directly contradicted the true nature and hidden design of the Affected Vehicles and their actual emissions when operating under normal circumstances.

74.     Volkswagen knew the representations were false when it made them and intended to defraud purchasers thereby.

75.     Volkswagen also had a duty to disclose, rather than conceal and suppress, the full scope and extent of the emissions deception because:

     (a) Volkswagen had exclusive knowledge of the actual emissions in the Affected Vehicles and concealment thereof;

     (b) The details regarding the actual emissions in the Affected Vehicles and concealment thereof were known and/or accessible only to Volkswagen;

     (c) Volkswagen knew Plaintiffs and Class Members did not know and could not reasonably discover the actual emissions in the Affected Vehicles and concealment thereof; and

     (d) Volkswagen made general representations about the qualities of the Affected Vehicles, including statements about their performance, fuel economy, and emissions, which were misleading, deceptive and incomplete without the disclosure of the fact that Volkswagen secretly designed and installed Defeat Device software on the Affected Vehicles that was intended to conceal the vehicles' exceedingly high and illegal emission levels from governments, consumers and the public.

76.     Volkswagen's concealment was likewise uniform across all Class Members in that Volkswagen concealed from everyone other than itself, including potential customers and regulators, the true facts relating to the emission levels of the Affected Vehicles.

77.     Volkswagen's misrepresentations and omissions were material in that they would affect a reasonable consumer's decision to purchase or lease an Affected Vehicle.

Consumers paid a premium for the Affected Vehicles precisely because they supposedly offered low emissions and fuel economy without sacrificing performance. Volkswagen's conduct, misrepresentations, omissions, concealment and suppression undermined the core value proposition that induced consumers to purchase or lease the Affected Vehicles, and directly affect both the quality and worth of the vehicles.

78. Volkswagen's intentionally deceptive conduct – its silent fraud and fraud by concealment – likewise induced the Affected Vehicles' purchase by Plaintiffs and Class Members, and the resulting harm and damage to them.

79. Plaintiffs relied upon Volkswagen's misrepresentations and concealment of the true facts. Class Members are presumed to have relied upon Volkswagen's misrepresentations and concealment of the true facts because those facts are material to a reasonable consumer's purchase the Affected Vehicles.

80. As a result of Volkswagen's inducements, Plaintiffs and Class Members have sustained significant damage, including, but not limited to, lost vehicle value and diminished vehicle quality and utility. If Plaintiffs and Class Members had known about the Defeat Device and the unlawful emissions at the time of acquisition, they would not have acquired the Affected Vehicles. Indeed, the Affected Vehicles could not have been marketed or sold to any reasonable consumer had existence of the Defeat Device been disclosed. Volkswagen is therefore liable to Plaintiffs and Class Members in an amount to be proven at trial.

81. Volkswagen intentionally designed and engineered its "clean diesel" vehicles to deceive and cheat regulators and its customers. Volkswagen touted the performance and environmental virtues of these vehicles, while concealing and suppressing the truth about them, for the purpose of inducing Plaintiffs and the Class to buy them. Volkswagen's fraud caused

both the purchase and the harm.  In order to undo this harm, Volkswagen must repair or remediate the vehicles so that they deliver everything it promised when it sold them, or undertake to buy them back from Class Members in terms that are just and equitable under principles of rescission, restitution and benefit of the bargain.

82.    Volkswagen's conduct was systematic, repetitious, knowing, intentional and malicious, and demonstrated a lack of care and reckless disregard for the rights and interests of Plaintiffs, the Class, the public and the environment. Volkswagen's conduct thus warrants an assessment of punitive damages under Cal. Civ. Code § 3294 and other applicable states' laws, consistent with the actual harm it has caused, the reprehensibility of its conduct, and the need to punish and deter such conduct.

## COUNT III
## NEGLIGENT MISREPRESENTATION
### (On Behalf of the Nationwide Class and the Massachusetts Subclass)

83.    Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

84.    Defendants owed a duty of care to Plaintiffs and the Class Members to, at a minimum, provide complete and accurate information regarding the fuel economy of the Affected Vehicles.

85.    The information conveyed to Plaintiffs and the Class Members regarding the fuel economy and low emissions of the Affected Vehicles was not prepared or conveyed with reasonable care.

86.    Plaintiffs' and the Class Members' reliance on Defendants to act with reasonable care in providing accurate information regarding the emissions and fuel economy of the Affected Vehicles was justifiable, and the true information regarding the emissions and EPA

fuel economy estimate of the Affected Vehicles was not readily discoverable at the time of purchase.

87.     Plaintiffs and the Class Members suffered monetary damages by their justifiable reliance on Defendants' negligent misrepresentations in an amount to be decided at trial.

**COUNT IV**
**BREACH OF CONTRACT**
**(On Behalf of the Nationwide Class and the Massachusetts Subclass)**

88.     Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

89.     Plaintiffs bring this count on behalf of the Nationwide Class and the Massachusetts Subclass.

90.     Each sale or lease of an Affected Vehicle constitutes a separate contract between Volkswagen and the purchaser or lessee of the vehicle.

91.     Because Volkswagen made misrepresentations and omissions in connection with its sale and/or lease of the Affected Vehicles, including its misrepresentations concerning fuel efficiency and the existence of the Defeat Device, Plaintiffs and the Class Members did not acquire automobiles that were street legal or have the characteristics promised by Volkswagen and thus did not obtain the benefit of their bargain.  Indeed, absent those misrepresentations or omissions, Plaintiffs and the Class Members would not have purchased or leased the Affected Vehicles at the prices they paid or would have purchased or leased alternative vehicles.

92.     As a direct and proximate cause of Volkswagen's breaches of contract, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial, which may include compensatory damages, incidental and consequential damages and other damages allowed by law or equity.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of the Nationwide Class and the Massachusetts Subclass)**

93.     Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

94.     Plaintiffs bring this count on behalf of the Nationwide Class and the Massachusetts Subclass.

95.     Volkswagen has been unjustly enriched in that it intentionally sold the Affected Vehicles with Defeat Devices which were intended to mask the fact that the Affected Vehicles did not comply with applicable automobile exhaust regulations and could not deliver the combination of low emissions, high performance, and fuel economy promised to consumers.

96.     Plaintiffs and Class Members conferred a benefit on Volkswagen by purchasing, and paying a premium for, the Affected Vehicles.

97.     When purchasing their vehicles, Plaintiffs and Class Members reasonably believed that the Affected Vehicles complied with applicable environmental regulations and, if properly tested in accordance with EPA mileage standards, would achieve the mileage stated on the window sticker of the vehicles. They also believed that the Affected Vehicles would perform as advertised and warranted.

98.     Plaintiffs and Class Members got less than what they paid for in that the Affected Vehicles did not comply with applicable environmental regulations, nor was the EPA mileage stated on the sticker usable for comparison purposes for other vehicles. Moreover, the Affected Vehicles did not deliver the promised combination of low emissions, high performance, and fuel economy that Plaintiffs and Class Members were promised.

99.     Volkswagen knows of and appreciates the benefit conferred by Plaintiffs and

Class Members and has retained that benefit notwithstanding its knowledge that the benefit is unjust.

100. The foregoing did not occur by happenstance or conditions out of Volkswagen's control. In fact, the Affected Vehicles were deliberately designed to comply with environmental regulations only when being tested and were known and intended by Volkswagen to not comply with applicable regulations under ordinary driving conditions.

101. Volkswagen should therefore be required to disgorge the unjust enrichment.

**COUNT VI**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Nationwide Class and the Massachusetts Subclass)**

102. Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

103. Plaintiffs bring this claim on behalf of the Nationwide Class and the Massachusetts Subclass.

104. Volkswagen, through the Affected Vehicles' written window stickers, advertisements, brochures, website and other marketing materials, made representations to Plaintiffs and the Class Members about the "green" and "clean" qualities of its diesel engines and expressly warranted to Plaintiffs and Class Members that the vehicles at least complied with all applicable laws and regulations relating to exhaust emissions, as it would be impossible for an automobile to be "green" if it emitted more pollutants than were allowed by applicable environmental laws and regulations.

105. Moreover, by advertising the low emissions in combination with statements regarding the performance, torque and fuel efficiency, Volkswagen warranted to purchasers of the Affected Vehicles that the vehicles would exhibit this combination of characteristics. Such statements became the basis of the bargain for Plaintiffs and Class Members because such

statements are among the facts a reasonable consumer would consider material in the purchase of a vehicle.

106.    Despite these representations, in ordinary driving conditions, the Affected Vehicles did not comply with applicable environmental regulations, and instead emitted between 10 and 40 times the amount of pollutants allowed during normal operation.  As such, it was unlawful for Volkswagen to sell the vehicles to the public.

107.    In addition, Volkswagen stated that the Affected Vehicles achieved certain fuel economy when tested in accordance with applicable EPA regulations.  Those statements created an express warranty that the Affected Vehicles achieved the stated fuel efficiency, allowing consumers to make appropriate comparisons with other vehicles.   Testing under EPA regulations presupposes that the vehicles comply with all laws and regulations applicable to automobiles, including environmental regulations.

108.    In fact, had the Affected Vehicles been tested in accordance with EPA fuel efficiency standards, while also complying with pollution regulations, they would have achieved significantly lower fuel efficiency than was stated on the EPA mileage sticker on the vehicle.  In addition, the Affected Vehicles are not adequately labeled because they misstate that the Affected Vehicles comply with EPA regulations and the stated gas mileage for comparison purposes was not achieved by testing in accordance with EPA testing procedures.

109.    As a result of the foregoing breaches of express warranty, Plaintiffs and the Class Members have been damaged in that they purchased vehicles that were unlawfully sold, did not comply with government regulations, did not perform as promised and were less valuable than what they cost.

## COUNT VII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of the Nationwide Class and the Massachusetts Subclass)

110.    Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

111.    Plaintiffs bring this Count on behalf of the Nationwide Class and the Massachusetts Subclass.

112.    The Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.

113.    Specifically, the Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative, and the TDI Engine System was not adequately designed, manufactured and tested.  Volkswagen had notice of these issues by virtue of its intentional conduct and notices by the EPA and individual state regulators.

114.    Plaintiffs and the Class Members have had sufficient direct dealings with either Volkswagen or their agents (dealerships) to establish privity of contract between Plaintiffs and the Class Members.  Notwithstanding this, privity is not required in this case because Plaintiffs and the Class Members are intended third-party beneficiaries of contracts between Volkswagen and its dealers; specifically, they are the intended beneficiaries of Volkswagen's implied warranties.  The dealers were not intended to be the ultimate consumers of the Affected Vehicles and have no rights under the warranty agreements provided with the Affected Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiffs' and the Class Members' Affected Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

115.    As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial.

### COUNT VIII
### VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
#### (Mass. Gen. Laws Ch. 93A
#### (On Behalf of the Massachusetts Subclass)

116.    Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

117.    Plaintiffs intend to assert claims under the Massachusetts Consumer Protection Act ("MCPA"), which makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce."  *See* Mass. Gen. Laws Ch. 93A § 2(1).  Plaintiffs will make the required demand on Defendant  pursuant to *See* Mass. Gen. Laws Ch. 93A § 9(3) and reserve the right to assert claims under the MCPA once the mandatory 30-day waiting period has expired.  This paragraph is included for the purpose of notice only and is not intended to actually assert a claim under the MCPA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the putative Class, pray for judgment as follows:

A.    an order certifying the proposed Nationwide Class, designating Plaintiffs as the named representatives of the Nationwide Class, and designating the undersigned as Class Counsel;

B.    an order certifying the proposed Massachusetts Subclass, designating Plaintiffs as the named representatives of the Massachusetts Subclass, and designating the undersigned as Class Counsel;

C.      a declaration that the Volkswagen is financially responsible for notifying all Class Members about the true nature of the Affected Vehicles;

D.      an order enjoining Volkswagen to desist from further deceptive distribution, sales and lease practices with respect to the Affected Vehicles, and directing Volkswagen to permanently, expeditiously and completely repair the Affected Vehicles;

E.      an order compelling Volkswagen to buy back the Affected Vehicles on fair and equitable terms;

F.      an award to Plaintiffs and Class Members of compensatory, exemplary, punitive and statutory penalties and damages, including interest, in an amount to be proven at trial;

G.      an award to Plaintiffs and Class Members for the return of the purchase prices of the Affected Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

H.      a declaration that the Volkswagen must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits received from the sale or lease of the Affected Vehicles, and make full restitution to Plaintiffs and Class Members;

I.      an award of attorneys' fees and costs, as allowed by law;

J.      an award of pre-judgment and post-judgment interest, as provided by law;

K.      leave to amend this Complaint to conform to the evidence produced at trial; and

L.      such other relief as may be appropriate under the circumstances.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury for all matters so triable.

Dated:  October  7, 2015

**BERMAN DEVALERIO**

<u>/s/ *Norman Berman*</u>
Norman Berman (BBO #040460)
Leslie Stern (BBO #631201)
Nathaniel L. Orenstein (BBO #664513)
Mark A. Delaney (BBO #652194)
One Liberty Square
Boston, MA 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
Email:  nberman@bermandevalerio.com
        lstern@bermandevalerio.com
        norenstein@bermandevalerio.com
        mdelaney@bermandevalerio.com


Nicole Lavallee
Joseph J. Tabacco, Jr. (BBO #491260)
A. Chowning Poppler
One California Street, Suite 900
San Francisco, CA  94111
Telephone: (415) 433-3200
Facsimile:  (415) 433-6282
Email:  nlavallee@bermandevalerio.com
        jtabacco@bermandevalerio.com
        cpoppler@bermandevalerio.com

*Counsel for Plaintiffs and the Proposed Class
and Subclass*